# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1756

_____

United States of America,                  *
                                            *
            Plaintiff - Appellee,           *
                                            *    Appeal from the United States
      v.                                    *    District Court for the
                                            *    District of Minnesota.
Jose Angel Almendares,                      *
                                            *
            Defendant - Appellant.          *

_____

Submitted: November 15, 2004
Filed: February 11, 2005

_____

Before MURPHY, HANSEN, and MELLOY, Circuit Judges.

_____

MURPHY, Circuit Judge.

A jury convicted Jose Angel Almendares of aggravated bank robbery, and the district court[1] sentenced him to 78 months. Almendares argues on appeal that the district court erred by denying his motion to suppress DNA evidence and that it abused its discretion by admitting evidence of a prior armed robbery and by denying his motion for a new trial based on the government's failure to disclose evidence. We affirm.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

## I.

A masked man armed with a handgun robbed the United Prairie Bank in Round Lake, Minnesota on the morning of June 3, 2003. He used few words and relied mostly on gestures with his gun to direct people around the bank. One of the bank employees, who was forced out of his office and onto his knees, testified that the robber pressed the gun into his neck and shoulder as he knelt. The robber alternated between threatening him and pointing his gun at the two tellers. He placed a white plastic bag with blue lettering on the counter and directed a teller to fill the bag with cash, and she placed over $7,800 in it. Included in the cash was $500 bait money in the form of marked twenty dollar bills.

The robber left the bank through the front entrance. One of the employees watched him go outside, take off his ski mask, and turn the corner, but she was unable to see his face. The bank employees described the robber as an Hispanic man in his twenties or early thirties, between 5'7" and 5'10" tall, weighing 175 to 190 pounds, with a medium to dark complexion. He was wearing shorts, a gray sweatshirt, white work gloves, and a black ski mask with three holes cut out.

Bruce Bentele was stopped at an intersection near the bank when he saw a man come around the corner. He described him to police as Hispanic, 5'8" to 5'9" tall, of medium build, with short dark hair and a mustache. Bentele testified at trial that the man was carrying a white bag and had messy hair that looked like he had taken off a stocking cap. He was about eight feet from Bentele, and he waved and asked Bentele how the day was going as he walked quickly towards a light colored car.

While Craig Patten was stopped at the same intersection, he saw a man run down the street with a white bag after turning the corner. Patten saw him wave to Bentele in his pickup and run to a light blue gray car. He looked around, threw the white bag on the front seat, got into the car, and then accelerated quickly on the way

out of town. Patten described the man as an Hispanic male in his mid twenties, with dark hair and a mustache.

Law enforcement officers learned that Jose Almendares had cashed a check at the bank the morning of the robbery, and they arranged an interview with him that evening. Jose acknowledged that he had been at the bank and that he had been driving a gray Chevrolet Lumina which belonged to his brother Holvin. Jose informed the officers that his own car was being repaired, and the next day an officer discovered that Jose had paid a mechanic $1,460 in cash for repairs to his car. That cash included $420 in bait bills from the robbery, as well as $500 in $10 bills wrapped in rubber bands. The United Prairie Bank stores its ten dollar bills in that way.

Officers obtained a search warrant for the place where Almendares lived with his brothers, Alexis, Holvin, and Roger, and his cousin Alex. During the search officers found $1,435 in cash, including three of the $20 bait bills. The bait money was found in Jose's room, along with two shopping bags with blue or purple lettering. In other buildings on the property, the officers found a black ski mask and white gloves similar to those described by witnesses to the robbery. All five Almendares men were arrested. Subsequently officers learned that Jose Almendares had sent a $4,500 wire transfer to Honduras the day after the robbery.

FBI Special Agent Drew Helms showed a photo lineup to Bentele the day the five men were arrested. In the lineup were photographs of the five Almendares men and two other Hispanics. Agent Helms arranged the seven photographs on a table and asked Bentele if he recognized any of the men and from where. After viewing the photographs, Bentele picked up the picture of Holvin Almendares and said "I think this is the guy" or "It looks like this guy but I'm not sure." Helms did not include this information in his 302 report which was turned over to Almendares

before trial, together with a handwritten note Helms left for a sheriff's deputy stating "No I.D.!?".

The day after Jose's arrest for the bank robbery, a police officer requested a DNA sample from him as part of an investigation into an earlier robbery and sexual assault at a Mexican variety store in Worthington, Minnesota. That crime had taken place some seven months before, and Worthington is 12 to 15 miles from Round Lake. After realizing that Jose did not speak English well, the officer called a telephone interpreting service. Through the interpreter the officer told Almendares that he was investigating a different case and that he wanted a sample of his DNA. They then went over a consent form, line by line. Because the preprinted form was prepared for search of a car or building, the officer wrote in "DNA sample by mouth" and told the interpreter to tell Almendares that he wanted a sample from his mouth. Almendares signed the consent form, and the interpreter told the officer that Jose had said it was "okay" to take the sample. After Almendares signed the form and the interpreter was about to end the call, the officer asked, "He told you that I can take the sample, right?" The interpreter answered, "yes sir." The DNA evidence collected from Jose Almendares matched the DNA left at Video Lupita, the Mexican variety store, in October 2002, but the DNA collected from the other Almendares men did not.

A preliminary hearing was held on June 9, 2003, four days after Bentele saw the photo lineup. Defense counsel questioned Agent Helms about any photographic lineups that had been conducted during the investigation of the bank robbery. Helms testified that he had conducted such a lineup but that Bentele had not identified anyone and had been unable to distinguish any of the men in the pictures. Jose Almendares was indicted on July 1, 2003, for aggravated bank robbery in violation of 18 U.S.C. § 2113 (a), (d).

Almendares moved to suppress the DNA evidence, arguing that he had not consented to the search and that the officer had unreasonably relied on the interpreter's statement that he had. After a de novo review of the record, the district court adopted the report and recommendation of the magistrate judge[2] to deny the motion. The court found that the officer conducting the search had reasonably believed that Almendares had consented to the search, and it concluded that the evidence would have been inevitably discovered in any event because that officer had been instructed to obtain a search warrant if necessary.

When a defense investigator talked to Bentele, he said that he had identified a man in the lineup as the robber, but he was unable to say who it was he had identified. Due to the inconsistency between Bentele's statement and Agent Helms' testimony at the preliminary hearing, Almendares moved for an order compelling disclosure of any Brady material, in particular "[a]ny identification of persons other than the Defendant by witnesses to the alleged crime(s)." At the motion hearing, the defense again questioned Agent Helms about the lineup, and Helms testified that Bentele had not been able to recognize anyone in the photographs and had not positively identified the robber. The court entered an order compelling disclosure of evidence favorable to the defense, but nothing was provided to indicate Bentele had made any type of identification. A few weeks later a defense investigator showed Bentele the photo lineup that had been entered into evidence during the hearing, but Bentele was unable at that time to identify which photograph he had picked out some four months earlier.

Almendares also moved to exclude evidence of the Video Lupita crime. The court decided to admit evidence of the prior armed robbery, but to exclude any evidence of the sexual assault because of undue prejudice. The parties reached a

---

[2]The Honorable Jonathan Lebedoff, Chief United States Magistrate Judge for the District of Minnesota.

stipulation to ensure that the jury would not learn about the sex crime, and the court excluded evidence of the sexual assault which had produced the DNA evidence matched with Jose Almendares. Before leaving Video Lupita, the robber had taken the clerk into the back of the store, told her to undress, and then ejaculated on her body. A DNA sample was taken from the victim's underwear, but at trial she testified only that the robber had left material at the scene which had been turned over to the police.

The trial testimony began with bank employees. Barbara Bosma testified that on her way to work the morning of the robbery, she saw a charcoal gray or slate blue Chevy Lumina driven by a man wearing a stocking cap even though the weather was not that cold. She later saw the same man try to get into the bank lobby before it opened at 9:00 a.m. and then go over to the walk up window which opens earlier than the lobby. The teller at the walk up window testified that Jose Almendares was the only window customer before the lobby opened that morning.

The prosecutor called Bentele to the stand on the second day of trial. On direct examination he said that he had identified someone at the lineup who he thought was the robber. Almendares moved for a mistrial, arguing that the government had suppressed Brady material. The prosecutor responded that he had just learned that morning that Bentele had picked a photo out of the lineup and that Agent Helms had told him he only regards an identification as positive if it is certain. During a break Helms then told defense counsel that Bentele had identified Holvin Almendares as the man he thought was the robber, and this was in turn reported to the district court. The court denied the motion for mistrial, observing that the defense had discovered before trial that Bentele had picked out a man at the lineup and that it could have asked Helms about it before trial.

There were also witnesses who knew the Almendares men from their work at New Fashion Pork. Lowell Baumgarn testified that he saw Jose driving a gray

Chevrolet Lumina about twenty minutes after the robbery, on a road where he had not expected to see him. Baumgarn said that Jose slowed down and made a low wave, but he did not stop to talk as he normally would have. Lowell's father, Byron Baumgarn, testified that he had seen Jose at work early on the morning of the bank robbery and had seen a black ski mask hanging on a hook near him. Byron noticed that he was wearing shorts which struck him as unusual because Jose usually wore coveralls at work. Byron said that Almendares had asked that morning to borrow $1,500 for car repairs and a plane ticket, pleading that he desperately needed the money. Byron also testified that later that afternoon he saw a black stocking cap in the open trunk of the gray Lumina, then parked near a building where Jose and his brother Roger were working. He also said that Jose seemed shaky and nervous that afternoon. Two other coworkers who looked at the bank surveillance photos testified that out of the five Almendares men, Jose most closely matched the description of the robber. The photos also show that the little finger of the robber's left glove did not appear to be filled, and there was evidence that Jose had lost part of his left little finger.

The victim of the Video Lupita robbery testified at trial that a man with a gun entered the store around 8:00 a.m. on October 30, 2002. He placed a sign on the front door that read "closed today thank you" in Spanish, locked the front door, and turned off the lights. The man was wearing a black ski mask with three holes in it, white gloves, sweat pants, and a gray hooded sweatshirt. He spoke Spanish and told her to give him the money or he would shoot, to hurry up, and not to say anything or scream. The victim described the man as 5'8" to 5'9" tall and "bulky" but not fat. He pointed the gun towards her back and shoulder and walked her around the counter to get the money for him, and she could feel the gun being pressed into "the back part of [her] shoulder." The robber pointed to an orange plastic bag on the floor that she did not think had been in the store before he entered, and together they put money and jewelry in the bag. The court gave a limiting instruction on the use of the robbery evidence, telling the jury it could use the evidence to help decide whether any

similarity between it and the bank robbery suggested that the same person committed both acts. It also told the jury that "the mere fact that the defendant may have committed a similar act in the past is not evidence that he committed such an act in this case" and that it could not convict him simply because jurors believed he may have committed a bad act in the past.

After a five day trial, the jury convicted Almendares of aggravated bank robbery, in violation of 18 U.S.C. § 2113(a), (d). He moved for a new trial, arguing that the government's failure to disclose Bentele's identification of Holvin violated his rights under Brady v. Maryland, 373 U.S. 83, 87 (1963) (due process violated if prosecution suppresses evidence favorable to defendant and material to guilt or punishment). In ruling on the motion the district court observed that Almendares had known before trial that Bentele had identified another individual and that Agent Helms admitted during trial that Bentele had identified Holvin; Almendares therefore had sufficient time to prepare his defense and use the evidence at trial. The court characterized Bentele's identification of Holvin as weak and inconclusive and noted that the government's case had not depended on Bentele's identification. The court denied the motion for new trial and sentenced Almendares to 78 months imprisonment. Almendares appeals.

## II.

On appeal, Almendares argues that the district court clearly erred in its determination that the police officer reasonably believed he had consented to the DNA search and that that evidence would have been inevitably discovered. He also argues that the court abused its discretion in admitting evidence of the Video Lupita robbery and in denying his motion for a new trial.

A.

Almendares contends that the district court clearly erred in finding that the police officer had a reasonable belief that he had consented to the DNA search. The officer used a consent form intended for the search of a building or vehicle rather than a person, and Almendares argues that it was unreasonable for him to rely on a translation over the telephone. Almendares contends that the interpreter incorrectly interpreted the acronym "DNA" and his responses, such as interpreting "mmmhhh" as "yes," and that the officer showed he did not believe there was consent because he asked the interpreter after the form had been signed, "He told you I can have the sample, right?" Almendares argues the officer unreasonably relied on the interpreter's opinion that he had consented.

The government argues that it was objectively reasonable for the officer to believe that Almendares had consented to the DNA swab. The government notes that Almendares was told that the officer wanted a sample from his mouth, that after listening to a translation he signed a form consenting to a "DNA sample by mouth," that the interpreter told the officer that Almendares said it was okay to take the sample, and that Almendares opened his mouth for the swab. See United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (consent found where individual opened the door and allowed police to enter). The government also asserts that the general atmosphere of the search was noncoercive and that Almendares' conduct supports a finding of reasonableness because he did not seem nervous, appeared competent, and was not under the influence of drugs or alcohol.

We review the district court's finding of consent for clear error. United States v. Morreno, 373 F.3d 905, 910 (8th Cir. 2004). A warrantless search does not violate the Fourth Amendment if knowing and voluntary consent was given. United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004). The government bears the burden of proving voluntary consent by a preponderance of the evidence and must

show that on the totality of the circumstances the officer reasonably believed that the search was consensual. Id. at 684-85; United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998). In examining the reasonableness of the officer's belief, we consider the nature of the encounter and the characteristics of the consenting party, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990).

In this case the translated record of the telephone call with the interpreter indicates that she told Almendares that the officer wanted to take a sample from his mouth and that he could withdraw his consent at any time. Almendares also said he understood the contents of the consent form before signing it. The police officer testified at the suppression hearing that he had not understood the Spanish exchange between Almendares and the interpreter, but that he had no reason to think the term "DNA" had been interpreted incorrectly. At the end of the telephone call, the officer checked again with the interpreter to make sure that Almendares had said he could take the sample, and the interpreter said yes. Almendares cooperated with the taking of the sample by opening his mouth and did not object at any time. The officer also testified that Almendares was pleasant, cheerful, and polite during the interaction.

We have upheld consent findings in similar situations where the subject did not speak English. See e.g., Cedano-Medina, 366 F.3d at 685-87 (officer reasonably believed that suspect consented to search of truck when he opened the door and stood back during search even though he spoke broken English and initially appeared confused); Sanchez, 32 F.3d at 1335-36 (consent found where one defendant interpreted for the other, both signed a consent form and cooperated, and neither objected). We conclude after our review of the record that the district court did not clearly err in finding consent.

B.

Almendares also contends that the district court abused its discretion by admitting the Video Lupita robbery evidence under Rule 404(b) on the issue of identity, without first having determined that there were unique similarities between the two robberies, citing United States v. LeCompte, 99 F.3d 274, 278 (8th Cir. 1996) (similarities must tend to prove unique modus operandi). We explained in United States v. Carroll, 207 F.3d 465, 469 (8th Cir. 2000), that before admitting evidence of a prior act on a theory of signature facts or modus operandi, the district court should make a threshold determination that the evidence would permit the jury to find that the same person committed both crimes because of their similarities. Almendares argues that the district court did not make that finding and that the two robberies were very different. He claims there were only a few similarities, such as use of a ski mask, a gun, and gloves, and that they were too common to satisfy the test for modus operandi evidence. Almendares also contends that the prejudice to him substantially outweighed the probative value of the evidence and prevented him from receiving a fair trial.

The government responds that the district court did not abuse its discretion in admitting evidence of the Video Lupita robbery, given the similarities in the crimes and the short time between them. It contends that evidence of the Video Lupita robbery was particularly probative on the issue of identity because Jose's trial strategy was to show that one of his brothers had committed the bank robbery and the brother looked like Jose. The district court also took proper steps to limit the danger of unfair prejudice it says, and the evidence was also admissible to prove intent or absence of mistake or accident.

The district court has broad discretion in admitting other crimes evidence. United States v. Mays, 822 F.2d 793, 797 (8th Cir. 1987). We review its Rule 404(b) decision for abuse of discretion and "reverse only when such evidence clearly had no

bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Howard, 235 F.3d 366, 372 (8th Cir. 2000) (quoting United States v. Brown, 148 F.3d 1003, 1009 (8th Cir. 1998), cert. denied, 525 U.S. 1169 (1999)). Under Rule 404(b), evidence of a prior crime, though inadmissible to show that a person acted in conformity with the prior act, may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Such evidence is admissible if it is (1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value. Carroll, 207 F.3d at 469 n.2; Howard, 235 F.3d at 372. The district court instructed the jury that it could consider evidence of the Video Lupita robbery to show identity.

If the conduct underlying the prior act and the current charged offense involved a unique set of "signature facts," then evidence of the prior act is admissible to show that the same person committed both crimes. Carroll, 207 F.3d at 468. In order to admit identity evidence on a signature facts or modus operandi theory, the district court must make a threshold determination that a reasonable juror could find from comparing the acts that the same person committed both crimes. Id. at 469. Two factors relevant to this determination are the distinctiveness of the facts that make the crimes unique and the distance between the crimes in space and time. Id.

In this case an Hispanic male committed both robberies, and eyewitnesses to both crimes gave similar descriptions of his height and build. The Video Lupita robber wore a black ski mask, a gray hooded sweatshirt, sweat pants, and white gloves; the bank robber wore a black ski mask, a gray sweatshirt, jean shorts, and white gloves. In both instances the robber spoke very few words, used a handgun aggressively to direct the victims, and pushed his gun into their shoulders. The Video Lupita robbery took place at 8:00 a.m. just after the store opened. Although the bank

robbery occurred at 11:00 a.m., testimony showed that Almendares had cashed a check at the bank before the lobby opened at 9:00 a.m. The bank robbery took place seven months after the Video Lupita robbery, and the fifteen mile distance between the robberies was small, particularly since both took place in a rural area. See United States v. Smith, 103 F.3d 600, 603 (7th Cir. 1996) (forty mile distance between crimes was small, especially when considered in the context of rural northwest Wisconsin).

We are satisfied that the district court applied the correct standard in admitting the prior crimes evidence. The district court applied the Rule 404(b) factors and found that the robberies were similar and close enough in time to be relevant on the issue of identity. As we noted in Carroll, the threshold question of whether a reasonable juror could conclude that the same person committed both crimes is essentially no different from the inquiry in the first two parts of the general Rule 404(b) test. Carroll, 207 F.3d at 469 n.2.

The district court also gave a limiting instruction to the jury telling it that the evidence could not be used to show that Almendares would be more likely to have committed the bank robbery if he had committed a robbery in the past. The use of such an instruction decreases the danger that unfair prejudice will result from admission of the evidence. United States v. Mays, 822 F.2d 793, 797 (8th Cir. 1987). The district court was also careful to keep the jury from learning about the sexual assault at Video Lupita to prevent unfair prejudice to Almendares. Deference is due its judgment in balancing the probative value of evidence against its prejudicial effect. Id. We conclude that the district court did not abuse its discretion in admitting evidence of the Video Lupita robbery.

C.

Almendares argues that the government's failure to disclose Bentele's identification before trial impaired his pretrial investigation and forced him to change his strategy in the middle of trial and that the district court failed to consider the effect the nondisclosure had on his defense. Before learning that Bentele had identified Holvin, the defense strategy was to show that any one of the other Almendares men could have robbed the bank. They looked alike, and Jose could argue the reason he had the bait bills was that the others turned over their money for him to pay their expenses. If he had known about Bentele's identification he says, his defense would have focused on an investigation of Holvin and would have approached the cross examination of Bentele differently. Almendares argues that he was unable to use the late disclosure effectively because even though he was able to refocus his defense on Holvin, he still had to mention his other relatives as promised in his opening. The respective heights, weights, builds, and facial features of Holvin and Jose became especially important, and the defense had to rely on pictures and witness testimony about Holvin since he had meanwhile been deported to Honduras. It claims that it would have sought a material witness warrant to stop his deportation if it had known about Bentele's identification earlier.

Almendares complains that Helms gave false and misleading testimony at the preliminary and motion hearings, that the government violated a court disclosure order, and that confidence in the verdict was undermined as a result. Since the jury deliberated for two days and twice sent notes to the judge asking what to do if it could not reach a unanimous decision, this was a close case he contends. He argues the government should not be permitted to disclose evidence at the last minute and that failure to find a Brady violation here would create an intercircuit conflict with Grant v. Alldredge, 498 F.2d 376 (2d Cir. 1974) (Brady violation when identification not

-14-

disclosed prior to trial and evidence would have led to other information that could have produced reasonable doubt).[3]

The government argues that there was no <u>Brady</u> violation because Almendares knew before trial that Bentele had identified someone, learned at trial that he had identified Holvin, used that evidence at trial, and its disclosure did not affect the trial outcome. In its opening statement the defense said that any of the other Almendares men, including Holvin, could have committed the robbery and that "it was Holvin that was really the one who needed the money." The government notes that Helms was extensively crossexamined during its case, that he was recalled by the defense in its case to testify about the lineup, and the fact that Bentele had identified Holvin was used repeatedly at trial by the defense. The defense introduced several photographs of Holvin and questioned witnesses about his physical description and his need for money and also presented evidence that any of the other Almendares could have committed the robbery. The government contends that even if the pretrial nondisclosure were a <u>Brady</u> violation, the error would be harmless given the strong evidence of Jose's guilt.

The government states in addition that the prosecution had not known that Bentele had identified anyone at the lineup until he was crossexamined at trial and until Helms revealed that he had picked out Holvin's picture. It also explains that Helms previously testified that Bentele had not recognized anyone at the lineup because he had interpreted the questions to ask whether Bentele had made a positive identification and Helms did not believe he had.

---

[3]Almendares also suggests that his due process rights were violated even if there were no <u>Brady</u> violation, citing <u>United States v. Gonzales</u>, 90 F.3d 1363, 1369 n.3 (8th Cir. 1996), and <u>Nassar v. Sissel</u>, 792 F.2d 119, 122 (8th Cir. 1986). Due process is generally satisfied if evidence is disclosed in time for the defense to take advantage of it, <u>Nassar</u>, 792 F.2d at 121, and that was the case here.

To establish a Brady violation, a defendant must show that the government suppressed exculpatory evidence that was material either to guilt or to punishment. United States v. Ryan, 153 F.3d 708, 711 (8th Cir. 1998). Evidence is material under Brady "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). The critical question, however, is whether the defendant received a trial resulting in a verdict worthy of confidence. Kyles, 514 U.S. at 434. We review the district court's denial of a new trial motion based on a Brady claim for abuse of discretion. United States v. Gary, 341 F.3d 829, 832 (8th Cir. 2003).

We do not approve of any government agent avoiding a forthright disclosure of relevant information. Even if Agent Helms interpreted Bentele's identification at the lineup to be tentative or unsure, it should have been disclosed. Failure to disclose such information could lead to a reversal and remand for a new trial if it seriously affected the defendants' rights. Bagley, 473 U.S. at 675-76. Although a defendant's Brady rights are violated if he discovers information after trial "which had been known to the prosecution but unknown to the defense," Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986), the same is not true if the evidence is discovered during trial. United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996). Under the rule in our circuit Brady does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial. Nassar, 792 F.2d at 121.

Here, Almendares was able to use the information at trial, the jury was aware that Bentele had identified Holvin, defense counsel chose not to recall Bentele to the stand, and Helms was crossexamined regarding Bentele's identification and his own testimony. Pictures of Holvin and his need for money were introduced into evidence, and defense counsel argued in closing that Bentele's identification of Holvin created

-16-

a reasonable doubt as to Jose's guilt. The prosecutor was not involved in suppressing the evidence, and it was disclosed in time to be used effectively at trial.

There was also strong evidence pointing to Jose's guilt. He met the description of the robber, and his missing finger was consistent with the bank surveillance picture showing the robber's gloved left hand. Officers found bait bills in Jose's room, he used bait money to pay a mechanic, he was seen by a bank employee wearing a stocking cap in the car on the morning of the robbery, and a stocking cap was later seen in the trunk of the car he had driven. His coworkers testified about his unusual behavior that day, the presence of a ski mask near him at work, and his expressed need for money. The DNA evidence indicated that Jose had committed a similar morning robbery seven months earlier, where a gun had also been pressed against the victim and used to direct activity, the proceeds had been gathered in a plastic bag, and the robber spoke no English. We conclude that the result of the trial would not have been different if Bentele's identification had been disclosed earlier, Kyles, 514 U.S. at 433-34, and that the district court did not abuse its discretion in denying the motion for a new trial.

## III.

The district court did not clearly err in finding that the officer reasonably believed that Almendares had consented to the DNA search, and it did not abuse its discretion in admitting evidence of the Video Lupita robbery. The district court also did not abuse its discretion by denying the motion for a new trial because Almendares was able to use the Bentele identification evidence at trial and there was other strong evidence pointing to his guilt. We therefore affirm the judgment.

_____