# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3412

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Cassandra Larae Holmes, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 16, 2005
Filed: August 30, 2005

_____

Before WOLLMAN, HANSEN, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Cassandra Larae Holmes appeals from her conviction on one count of conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and one count each of aiding and abetting possession with intent to distribute cocaine base and aiding and abetting the distribution of cocaine base, both in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. We affirm.

## I.

This case arises out of the same drug transactions detailed in our opinion in United States v. Rey Gama Mendoza, No. 04-1386 (8th Cir. Aug. 30, 2005). In April 2003, Officer Gregory Knoll of the Minneapolis Police Department received information from Thomas Lloyd Carnell (a.k.a. "Tom Cat"), a self-described bounty hunter and skip tracer acting as a confidential informant, suggesting that Holmes was selling crack cocaine. Tom Cat and Holmes are related by blood and had known each other for an extended period of time. In addition, Tom Cat's father had lived in Holmes's residence until his eviction for failure to pay rent. Tom Cat and Knoll agreed that Tom Cat would provide information on Holmes and other narcotics dealers in exchange for Knoll's assistance in locating a felon that Tom Cat was tracking.

As part of his agreement with Knoll, Tom Cat purchased two one-quarter-ounce quantities of crack from Holmes in controlled buys in early May. In addition, Tom Cat contacted Holmes to set up a transaction between her and undercover Officer Luis Porras. On May 22, Holmes sold one ounce of crack to Porras. On June 5, Holmes sold an additional four ounces of crack to Porras and was arrested immediately thereafter, along with her drug source (Mendoza). Both of the transactions took place at Holmes's residence. As a result of his assistance in the case, Tom Cat received a series of cash payments from the Minneapolis Police Department, including $250 for introducing Porras to Holmes, $250 after the May 22 deal, and $300 after the June 5 deal.

Prior to her joint trial with Mendoza, Holmes filed a number of motions seeking information on Tom Cat's identity and his connection to the investigation. The government initially stated that Tom Cat was a mere tipster and would not be called as a witness and that information regarding his role in the case thus need not be disclosed. Such information—including vouchers detailing the cash payments to Tom Cat and the drugs seized in the two controlled buys conducted by Tom Cat—was

ultimately disclosed in the five-day period preceding commencement of trial. Holmes was able to produce Tom Cat as a witness and examine him at trial.

During the presentation of its case, the government elicited testimony tending to show Holmes's familiarity with the drug trade and the lack of inducement by government agents. For example, Porras testified that Holmes was not nervous or hesitant during either deal, that she spoke of other customers and her ability to supply them with upwards of five ounces of crack per transaction, and that she informed Porras that she "was not in the business of ripping people off," thus inducing drug buyers to become repeat customers. Porras also testified that Holmes recognized his mention of "hard tacos" during both deals as referring to ounces of crack, which was the term's common use in the street drug lexicon. Furthermore, the government adduced testimony that the manner in which persons who deal drugs out of their home conduct themselves—possessing only the drugs needed for the deal, relying on couriers from drug sources to quickly supply drug quantities and retrieve deal money, and locking their doors during larger deals—was consistent with Holmes's actions during both deals. In response, Holmes put forward evidence that the government could not identify any other drug customers besides Porras and Tom Cat and that Tom Cat himself did not know Holmes to conduct drug transactions until the controlled buys.

Holmes subsequently sought a jury instruction on the affirmative defense of entrapment. The district court[1] declined to give the instruction, finding that Holmes had not presented sufficient evidence to submit the issue to the jury. The jury subsequently convicted Holmes and Mendoza on all three counts. The district court denied Holmes's two motions for a new trial and sentenced her to a term of 121 months' imprisonment, 5 years of supervised release, and a $300 special assessment.

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

## II.

Holmes first argues that the district court erroneously refused to submit her entrapment defense to the jury. We review *de novo* the district court's decision that Holmes presented insufficient evidence to support an entrapment instruction. United States v. Benning, 248 F.3d 772, 775 (8th Cir. 2001).

"The question of entrapment is generally one for the jury, rather than for the court." Mathews v. United States, 485 U.S. 58, 63 (1988). Thus, Holmes was entitled to an entrapment instruction if she came forward with "sufficient evidence from which a reasonable jury could find entrapment." Id. at 62; United States v. Huff, 959 F.2d 731, 737 (8th Cir. 1992). To do so, she was required to present evidence sufficient for a reasonable jury to conclude that: (1) government agents induced her to engage in the drug transactions; and (2) she was not predisposed to commit the criminal acts prior to first being contacted by government agents. Jacobson v. United States, 503 U.S. 540, 548-49 (1992); United States v. Kurkowski, 281 F.3d 699, 701 (8th Cir. 2002). There is no dispute that Tom Cat was a government agent at all times relevant to this appeal.

Holmes contends that she presented sufficient evidence for a reasonable jury to find that Tom Cat induced her to commit the offenses of conviction, based upon the admission of records entailing cash payments to Tom Cat and the volume of calls between Tom Cat, Holmes, and law enforcement officers in the hours surrounding each deal. Holmes specifically argues that the fact that she and Tom Cat conversed by phone a total of five times on the day before and the day of the May 22 deal and a total of four times during the day before and the day of the June 5 deal, all in close temporal proximity to numerous conversations between Tom Cat and Knoll (fourteen and seventeen, respectively), constitutes circumstantial evidence of inducement when combined with the cash payments. We disagree. Given the preexisting relationship between Holmes and Tom Cat, the number of times Tom Cat had personally visited Holmes's residence prior to the investigation, and the fact that both Holmes and Tom

-4-

Cat were the originating parties at different times, the volume of calls and their timing strikes us as nothing more than coincidence. In addition, because Holmes presented no evidence detailing the content of the conversations, she cannot rely on speculation about their possible content to supply a sufficient evidentiary basis for the inducement prong of her entrapment defense. See Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 833 (8th Cir. 1996). In the absence of evidence of sufficient direct inducement exercised by Tom Cat on Holmes, the payments to Tom Cat for his information in connection with the officers' investigation do not give rise to an inference of inducement on the part of government agents.

Furthermore, we have stated that the entrapment defense "should not preclude officers from using stealth or strategy to trap an unwary criminal, or from providing a criminal with the opportunity to commit a crime." United States v. Hinton, 908 F.2d 355, 358 (8th Cir. 1990). As set forth above, the officers involved in the investigation testified that Holmes exhibited a working knowledge of terms used in the drug trade, conducted herself during the transactions in a manner comporting with one who deals narcotics out of the home, and discussed with Porras her dealings with other customers, her desire to engage in future deals, and her ability to secure certain quantities of crack. These facts establish not only that the government merely provided Holmes the opportunity to engage in illicit drug transactions, but also that Holmes was predisposed to do so. Although the government was not able to specifically name any of Holmes's other drug customers, such an identification was unnecessary because Holmes's own statements to Porras establish the existence of other customers. Accordingly, she was not entitled to submit her entrapment defense to the jury.

## III.

Holmes next claims that the district court erred by denying her motion for new trial. She asserts that the government's failure to produce evidence of the cash payments to Tom Cat and the drugs seized from the earlier controlled buys conducted

by Tom Cat and the Minneapolis Police Department until just prior to trial constituted a violation of its duties under Brady v. Maryland, 373 U.S. 83 (1963), and mandates a new trial. Specifically, she contends that the late disclosure deprived her counsel's private investigator of the opportunity to elicit at a pretrial interview statements from Tom Cat supporting her inducement argument. The government's disclosure pattern in a given case does not offend Brady, however, so long as the evidence in question is disclosed prior to the end of trial. United States v. Almendares, 397 F.3d 653, 664 (8th Cir. 2005); United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996). Here, it is undisputed that evidence of the cash payments and of the drugs from Tom Cat's controlled buys was disclosed prior to the commencement of trial. Furthermore, Holmes's counsel had ample opportunity to confront Tom Cat with the evidence when he called Tom Cat as a witness. Thus, the district court did not abuse its discretion by denying Holmes's motion on this ground. See Almendares, 397 F.3d at 664 (standard of review; Brady violation not present where "information is furnished before it is too late for the defendant to use it at trial").

Holmes further argues that an affidavit from her counsel's private investigator is newly discovered evidence warranting a new trial. The affidavit purports to memorialize an August 2004 telephone interview, held some eleven months following trial, between the investigator and Tom Cat, during which Tom Cat allegedly stated that he had pressured Holmes into making the May 22 and June 5, 2003, deals, that Holmes repeatedly told him that she did not want to do any drug deals, and that he was motivated to pressure Holmes by his perception that the Minneapolis Police Department would arrest him on a drug charge if he did not assist them in their investigation. Although the affidavit states that Tom Cat was willing to sign another affidavit affirming the investigator's account of the interview, no such affidavit has been filed.

To succeed on her claim for a new trial based upon newly discovered evidence, Holmes must show that the affidavit "is of such a nature that, in a new trial, [it] would

probably produce an acquittal." United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) (citation and internal quotations omitted) (modification in original). Because the affidavit is essentially a recantation of Tom Cat's trial testimony that he did not force or otherwise pressure Holmes and that the impetus for his cooperation with police was their assistance in locating a felon he had been tracking, we view it and its potential evidentiary value at a new trial with suspicion. See United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001).

Because the affidavit details the investigator's account of the interview, rather than Tom Cat's own direct statements, and is signed only by the investigator, it is likely hearsay and could not be introduced for its substantive truth at a new trial. See Fed.R.Evid. 801 (defining hearsay), 802 (hearsay inadmissible). To the extent that the affidavit might be used to impeach Tom Cat's testimony at a new trial, its potential value is negligible given that Tom Cat's testimony at the first trial is bolstered by testimony from Knoll establishing that Tom Cat first contacted the Minneapolis Police Department and was not trying to "work off" a prior charge. Furthermore, the affidavit's assertion that Holmes was unwilling to engage in drug deals is contradicted by the officers' accounts of her familiarity with the drug trade and her mention of other drug customers. Accordingly, the affidavit would unlikely produce an acquittal on retrial, and thus the district court did not abuse its discretion by denying the motion. See Rouse, 410 F.3d at 1009 (standard of review).

The judgment is affirmed.

_____