# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2602
_____

United States of America,

*Plaintiff - Appellee,*

v.

Jesse L. Cody,

*Defendant - Appellant.*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: June 14, 2023
Filed: August 9, 2023
_____

Before LOKEN, COLLOTON, ERICKSON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

A jury convicted Jesse Cody of four charges related to sex trafficking. Cody raises several challenges to his convictions, but we conclude that there was no reversible error, and therefore affirm the judgment of the district court.[*]

---

[*]The Honorable Robert F. Rossiter, Jr., Chief Judge, United States District Court for the District of Nebraska.

I.

In 2019, Cody was involved in the sex trafficking of two victims. The first, whose initials are A.M., met Cody in June 2019 when she was 22 years old. A.M. was a passenger using a rideshare service for which Cody was the driver.

During conversations after the ride, Cody told A.M. that his ex-girlfriend made money by getting paid to go on dinner dates. A.M. thought going out to dinner would be an easy way to earn money. Cody offered to help her get started.

A.M. agreed to work with Cody, but later learned that these dates would entail having sex with men for money. Cody advertised A.M.'s services online, and booked her appointments with men. Cody told A.M. that she had the potential to make millions of dollars, live a luxurious lifestyle, and travel the country.

Once A.M. started working, however, Cody kept about eighty percent of her earnings. Cody said that he was keeping most of the money to cover travel expenses, but A.M. later learned that he kept the funds for his personal use. A.M. ended up collecting only about five or six hundred dollars of the two to three thousand dollars that she generated through encounters with men. After about a month of working together, A.M. and Cody were arrested in an undercover sting operation.

The second victim, whose initials are J.R., met Cody through an online dating service in June 2019 when she was 18 years old. J.R. was living with a foster family and preparing to attend college in the fall. Cody told J.R. about his ex-girlfriend's line of work, and persistently encouraged J.R. to get involved.

After one summer meeting, Cody refused to take J.R. back to her foster home, and J.R. did not have the resources to travel home by herself. Although J.R. testified that she did not want to engage in sex work, Cody started introducing her to people

in the business and advertising her availability for sex online. J.R. had over fifty sexual encounters with men over the summer in Nebraska, Iowa, Missouri, and South Dakota. J.R. suffered physical abuse at the hands of male clients and Cody himself. She remained with Cody until she convinced him to bring her back to the foster home in September 2019.

A grand jury charged Cody with two counts of sex trafficking by force, fraud, or coercion, *see* 18 U.S.C. § 1591(a)(1), one count of enticing, persuading, or inducing a victim to travel in interstate commerce for the purpose of prostitution, *see* 18 U.S.C. § 2422(a), and one count of transporting a victim in interstate commerce for the purpose of prostitution, *see* 18 U.S.C. § 2421(a). The case proceeded to trial.

A.M. and J.R. testified for the prosecution. On the third day of trial, Cody notified the district court that he had discovered J.R.'s juvenile records on a public website of the state courts, and that he intended to use the records in an effort to impeach J.R. J.R. testified that she had been in foster care for "a couple of months" before she met Cody, but the newly discovered records showed that she had been in foster care about a week. The district court allowed Cody to question J.R. about this information.

The jury found Cody guilty on all four charges. The district court sentenced him to 192 months' imprisonment.

II.

A.

Cody first argues that the government violated his due process right to the disclosure of exculpatory or impeachment material under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to

disclose J.R.'s juvenile court records. Cody was aware of the alleged non-disclosure during trial, but did not raise an objection with the district court, so we review only for plain error. *See* Fed. R. Crim. P. 52(b). To obtain relief, Cody must show an obvious error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-36 (1993).

To establish a violation of the *Brady/Giglio* rule, Cody must demonstrate that the government suppressed evidence that was favorable to him and material to the outcome of the trial. *See United States v. Garrett*, 898 F.3d 811, 816 (8th Cir. 2018). There was no violation here, because Cody learned of the records during trial, and had an opportunity to use them in cross-examining the witness. *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005). If Cody needed more time to make use of the information, then he could have moved to continue the trial or sought other relief, but he did not do so. There was no obvious error.

B.

Cody next asserts that the district court erred by denying his motion for a new trial. *See* Fed. R. Crim. P. 33(a). We review the district court's order for abuse of discretion. *See United States v. Campos*, 306 F.3d 577, 580 (8th Cir. 2002).

Cody sought a new trial based on allegations that J.R.'s testimony was coached by a government agent. In post-trial affidavits, Cody's mother and fiancée wrote that they were in the courtroom before the third day of trial when Cody's attorney alerted the court to the inconsistencies between J.R.'s testimony and her juvenile records. Cody's mother and fiancée averred that they saw a federal agent send a text message and then exit the courtroom. They said that shortly thereafter, J.R. and the federal agent entered the courtroom from the same location. Once J.R. resumed the witness stand, Cody's attorney refreshed J.R.'s memory about foster care by showing her the

-4-

juvenile court records. J.R. then revised her testimony about how long she had lived with her foster parents.

Cody moved for a new trial on the ground that the federal agent allegedly warned J.R. about the impeachment material. On inquiry by the court, the agent relayed that she did not recall sending or receiving a text message, but that she did step out of the courtroom to tell J.R. that she was to take the stand again. The agent stated that she had no substantive conversation with J.R., and did not discuss the impeachment evidence.

The district court denied the motion for new trial. The court concluded that the amount of time J.R. lived with her foster family was not material to the issues in the case, and that the juvenile court records served only to impeach her prior testimony on a collateral matter. The court further explained that even if J.R. was aware of the impeachment material before she testified, Cody still was able to accomplish the desired impeachment by demonstrating the inaccuracy of J.R.'s earlier testimony.

The district court did not abuse its discretion in refusing to order a new trial. The allegation that the federal agent communicated with J.R. about impeachment material was speculative and controverted by the agent. In any event, whether J.R. lived with her foster parents for one week or two months was immaterial to the charged offenses, and Cody had an adequate opportunity to cross-examine J.R. about the inconsistency between her original testimony and the records. There was no error in denying the motion.

C.

Cody also challenges the sufficiency of the evidence on Count II, which charged him with the sex trafficking of A.M. by fraud. *See* 18 U.S.C. § 1591(a)(1). The government could prove its case by showing that Cody recruited or enticed A.M.,

knowing that fraud would be used to cause A.M. to engage in a commercial sex act. Cody contends the government failed to prove the element involving the use of fraud. The term "fraud" is not defined in § 1591, but this court has stated that "the common meaning" is "deception practiced in order to induce another." *United States v. Paul*, 885 F.3d 1099, 1105 (8th Cir. 2018).

At trial, A.M. testified that Cody told her that she could make thousands or millions of dollars, just like his ex-girlfriend supposedly earned by engaging in the same type of work. A.M. said that Cody told her that she would stay in "luxury hotels," and suggested that she could travel to desirable locations.

With respect to the money earned from sexual encounters, A.M. testified that she garnered "two to three thousand" dollars from her appointments over the month that she worked for Cody. She explained that after she gave Cody the cash, he gave her "maybe 20 percent," and "then he would take the rest and he'd say it's for our travel expenses." But A.M. said she knew of no travel expenses, and that she was located "in Omaha the whole time." A.M. testified that she later learned that Cody "just pocketed" the money that she generated. A.M. maintained that she would not have worked for Cody if she had known that he was going to keep eighty percent of the earnings.

A.M.'s testimony that Cody misrepresented her earnings was sufficient to allow a reasonable jury to convict. Cody induced A.M. to participate in sex work by assuring her that the activity would be profitable, and that the funds he retained would be used for legitimate expenses. The jury was entitled to credit A.M.'s testimony that Cody's representations to her were false and material to her decision to engage in sex work. The evidence of fraudulent inducement was sufficient to support the verdict. *See United States v. Bazar*, 747 F. App'x 454, 457 (9th Cir. 2018).

\* \* \*

-6-

The judgment of the district court is affirmed.

_____