# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1893

_____

Stanley Carter Liggins,         *
         *

     Petitioner - Appellant,     *
         *   Appeal from the United States
   v.         *   District Court for the Southern
         *   District of Iowa.
Ken Burger, Warden,       *
         *

     Respondent - Appellee.   *

_____

Submitted: December 13, 2004
Filed: September 1, 2005

_____

Before BYE, HANSEN, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

Stanley Carter Liggins was convicted in Iowa state court of first-degree murder in the death of nine-year-old Jennifer Lewis. Liggins's direct appeal and state petition for post-conviction relief were denied. Thereafter, he petitioned the federal district court for habeas corpus relief under 28 U.S.C. § 2254. The district court[1] dismissed the petition and issued a certificate of appealability (COA). On appeal, Liggins asks us to dismiss the indictment or vacate his conviction and remand for a new trial. We affirm.

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

# I

The burned body of nine-year-old Jennifer Lewis was found on the grounds of Jefferson Elementary School in Davenport, Iowa, at approximately 9:00 p.m. on September 17, 1990. A medical examination revealed her death was caused by manual strangulation; she had been sexually abused prior to death and was not alive at the time her body was burned. Jennifer, who lived with her mother Sherry Glenn and stepfather Joseph Glenn in Rock Island, Illinois, had last been seen at approximately 6:30 p.m. purchasing gum at Mac's Liquor Store in Rock Island.

On July 27, 1992, Liggins was charged in Iowa state court with first-degree murder, willful injury, first-degree sexual abuse, first-degree kidnapping and arson. He entered not guilty pleas. On October 1, 1992, Liggins moved to set aside or dismiss the charges, arguing, among other things, Iowa lacked criminal jurisdiction. The court denied Liggins's motion and on February 10, 1993, the case proceeded to trial. At the close of the state's case, the court granted Liggins's motion for judgment of acquittal on the arson charge but denied the motion as to the remaining charges. The jury found Liggins guilty on all remaining counts and he was sentenced to three life terms and a term not to exceed ten years on the willful injury conviction.

On appeal, the Iowa Supreme Court reversed the willful injury, first-degree sexual abuse, and first-degree kidnapping convictions concluding the state failed to present evidence establishing territorial jurisdiction. The Court denied Liggins's motion to set aside the murder conviction on sufficiency of evidence grounds, but reversed the conviction because the trial court erred by allowing in evidence of Liggins's drug dealing. State v. Liggins, 524 N.W.2d 181, 186, 188-89 (Iowa 1994) (Liggins I). In July 1995, the state retried Liggins on the first-degree murder charge. The jury found him guilty and he was sentenced to life imprisonment.

In his direct appeal following the second trial, Liggins argued the state lacked territorial jurisdiction over the murder charge because there was no proof the murder occurred in Iowa. Liggins also argued one of the jury instructions erroneously advised the jury it did not have to find the murder occurred in Iowa. Finally, he argued there was insufficient evidence to prove he murdered Jennifer.[2] The Iowa Supreme Court rejected Liggins's arguments and affirmed the first-degree murder conviction. State v. Liggins, 557 N.W.2d 263, 270 (Iowa 1996) (Liggins II). Liggins's state-court petition for post-conviction relief was also denied. Liggins v. State, No. 99-1188, 2000 WL 1827164, at *10 (Iowa Ct. App. Dec. 13, 2000) (Liggins III).

Liggins next filed a § 2254 habeas corpus petition arguing 1) ineffective assistance of trial and appellate counsel, 2) lack of territorial jurisdiction, 3) instructional error, 4) Fourth, Fifth, Sixth and Fourteenth Amendment violations, 5) sufficiency of the evidence, 6) violations of Brady v. Maryland, 373 U.S. 83 (1963), and 7) newly discovered evidence. The district court dismissed the petition but granted a COA. In this appeal, Liggins argues 1) there was insufficient evidence to prove he murdered Jennifer, 2) Iowa lacked jurisdiction to try him for murder because there was insufficient evidence to show the murder occurred in Iowa, 3) the jury was improperly instructed regarding the proof necessary to establish territorial jurisdiction, 4) the prosecution violated Brady, and 5) the federal district court erred when it denied his motion for discovery and an evidentiary hearing on his claim of newly discovered evidence.

---

[2]Liggins raised additional arguments in his direct appeal and state post-conviction proceedings which are not relevant to this proceeding.

II

Our review of Liggins's claims is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996(AEDPA). We may not grant a writ of habeas corpus with respect to any issue decided by the Iowa courts unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2). In Penry v. Johnson, 532 U.S. 782 (2001), the Supreme Court reiterated its interpretation of § 2254(d)(1)'s "contrary to" and "unreasonable application of" federal law standards.

> A state court decision is "contrary to" clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."

> * * *

> Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.

532 U.S. at 792-93 (citations omitted).

-4-

When reviewing a district court's denial of a § 2254 petition, we review the district court's findings of fact for clear error and conclusions of law (as cabined by AEDPA) de novo. King v. Bowersox, 291 F.3d 539, 540 (8th Cir. 2002).

A

Liggins first argues there was insufficient evidence to find him guilty beyond a reasonable doubt of first-degree murder. Within the context of § 2254, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("[U]nder 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.") (citation omitted). We presume the findings of fact made by the Iowa courts are correct unless Liggins rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Hall v. Luebbers, 341 F.3d 706, 712 (8th Cir. 2003).

Based on the evidence presented at trial, the Iowa courts held the jury properly convicted Liggins of first-degree murder. The evidence, viewed in the light most favorable to the verdict, demonstrates the following. At the time of the murder, Liggins resided at the Hillside Motel in Rock Island. He became acquainted with Joseph and Sheri Glenn the summer before the murder and frequently visited their home. About a week before the murder, a neighbor noticed Liggins's car parked a block from the Glenn home at about 6:30 p.m. and saw Jennifer talking to him through the window. On the day of the murder, Liggins stopped by the Glenns' house at approximately 5:30 p.m. At about 6:00 p.m., Jennifer's stepfather told her she could ride her bicycle to a friend's home. Within minutes, Liggins excused himself and left. A neighbor testified she saw Liggins drive his car down the street and stop before motioning Jennifer over to his car. The two spoke briefly before Jennifer got

-5-

on her bicycle and returned home. Liggins returned to the Glenn house ahead of Jennifer and reentered. After Jennifer returned, Liggins said he wanted some chewing gum and Jennifer produced a dollar bill saying she was going to nearby Mac's Liquor store to buy him gum. Within minutes of Jennifer's departure, Liggins left the Glenn home.

Charlotte McCray, the owner of Mac's, testified Jennifer bought a package of gum from her at approximately 6:30 p.m. A second witness, Antonio Holmes, testified he stopped at Mac's at 6:30 p.m. and saw a man matching Liggins's description standing outside the store next to a car. Upon entering the store, Holmes saw a young girl buying a package of gum with a dollar bill. When he left, Holmes noted the girl and Liggins were nowhere to be seen; Jennifer was not seen alive again. Two days after the murder, Holmes picked Liggins's photograph from a photographic lineup.

Jennifer's burned body was discovered across the river in Davenport, Iowa around 9:00 p.m. The investigation revealed her body had been doused in gasoline and set on fire. A witness, Lloyd Eston, testified he and his wife drove by Jefferson School between 8:15 and 8:30 p.m. and saw a man standing by a red four-door foreign-looking car (Liggins frequently drove a red Peugeot registered to his girlfriend Brenda Adams). Eston could not describe the man or state conclusively whether he made these observations on the night Jennifer was killed, but testified he was "pretty sure" the car was the red Peugeot.

A second witness, Wanda Hughes, testified she observed the red Peugeot near the school around 9:00 p.m. and noticed a fire burning on the school grounds. Hughes also testified one of the car's taillights was dimmer than the other. At trial, the state offered the rear portion of the Peugeot into evidence and demonstrated when illuminated one of the lights was dimmer.

The state also offered testimony from a resident of the Hillside Motel indicating he heard Liggins take a forty-five-minute shower at 4:00 a.m. the morning after the murder. Additionally, the state offered statements Liggins made to police showing he lied about his whereabouts the night of the murder. Liggins told police he went home after leaving the Glenn residence and called his sister twice but got an answering machine. Telephone records disproved the claim. Further, Liggins told police he had not seen or talked to Jennifer on the street the evening of the murder, but later admitted talking to her when told neighbors had seen her talking to a man they identified as Liggins. Next, the state offered testimony from Donna Atkins, Liggins's neighbor, indicating she walked by the Peugeot the day after the murder, smelled gas and saw a gas can in the backseat. Next, the state offered a gas can recovered from the Peugeot bearing Liggins's fingerprints, as well as evidence suggesting the backseat of the car had been washed recently. Finally, the state called Frank Reising who testified Liggins confessed to murdering Jennifer while the two shared a jail cell. Reising testified that after watching a television news report about the murder, Liggins told him he "did it and wouldn't get [convicted] for it" because "they didn't have nothing on [him]."

Liggins does not contend the evidence, if accepted, is insufficient to support the verdict. Rather, he offers additional evidence to show the state's evidence was largely unreliable. For example, he argues Holmes testified he contacted police after the murder because McCray told him Jennifer was in the store when he came in. McCray, however, testified she did not recall if anyone else was there when Jennifer came in. She further testified Jennifer said a friend was waiting and McCray thought a girl was waiting outside. Liggins also points to a police report indicating Holmes was intoxicated when he identified Liggins's photograph and later told police he was uncertain of the identification.

Next, Liggins attacks the testimony of the witnesses who observed his car in the area of the murder. Liggins argues Eston's identification of the Peugeot was

tentative; Eston could only state the car he saw was similar to the Peugeot. Further, Eston was unable to provide any description of the person standing near the trunk of the car except to say it was a male. Liggins also argues Eston's testimony is unreliable because it was presented by deposition and he was unable to cross-examine the deposition. Finally, Eston saw no fire at the time he observed the car.

Similarly, Liggins argues Hughes's testimony is unreliable because she saw the fire "a little after nine" while evidence established the police were called before 9:00 p.m. Further, Liggins contends Hughes was unable to provide an exact date for when she observed the fire and initially testified she could not even give a month. Later, Hughes testified it was likely September. Finally, Liggins argues Hughes's testimony regarding the appearance of the taillights was unreliable because she saw the vehicle at a distance of three blocks. Hughes testified nothing impeded her vision but was impeached with her testimony from the first trial indicating there may have been bushes blocking her view.

Liggins's attacks on the other evidence are of a similar ilk. He counters the state's evidence about the backseat of the Peugeot by arguing a window seal was defective and allowed rain to seep in soaking the floor. Liggins attempts to rebut evidence about the lengthy shower with testimony from his girlfriend indicating he spent the night at her home. Liggins counters Atkins's testimony about smelling gas with testimony from his girlfriend stating she had the car at the time Atkins claims to have made her observations. As for the purported jailhouse confession, Liggins argues Reising's testimony is unreliable because he admitted Liggins rarely spoke, did not trust him, and only testified to curry favor with police. Finally, Liggins points to the absence of any forensic evidence, e.g., hair, fibers, blood, etc., connecting him to the crime despite an exhaustive investigation.

The district court found some of the evidence conflicting and less than helpful to the prosecution but concluded the jury properly weighed the evidence and

credibility of the witnesses. The district court further found the Iowa courts' determination that there was sufficient evidence to support the verdict was not unreasonable. We agree. We presume the findings of fact made by the Iowa courts are correct unless rebutted by clear and convincing evidence. See § 2254(e)(1). Because we are not satisfied Liggins has presented sufficient evidence to call these findings into question, we reject his attack on the sufficiency of the evidence.

B

Liggins next argues the Iowa Supreme Court erred in concluding there was sufficient evidence to prove the murder occurred in Iowa.

Under Iowa law, a person is subject to criminal prosecution if "[t]he offense is committed either wholly or partly within this state." Iowa Code § 803.1(1)(a). Because territorial jurisdiction is an essential element of the crime, it must be proved beyond a reasonable doubt. Liggins I, 524 N.W.2d at 184-85. In cases of murder, Iowa Code § 803.1(2) creates a permissive rebuttable presumption of territorial jurisdiction by providing "[i]f the body of a murder victim is found within the state, the death is presumed to have occurred within the state." Id. at 185.

In his direct appeal, Liggins argued there was insufficient evidence to prove territorial jurisdiction. The Iowa Supreme Court rejected the argument, holding

> Jennifer's body was found in Davenport, Iowa. Further, the evidence in the record does not conclusively establish if she was killed in Iowa or Illinois. We conclude that there was sufficient evidence to establish Iowa's territorial jurisdiction on the murder charge and that Liggins did not rebut the statutory presumption.

Liggins II, 557 N.W.2d at 266-67.

The district court held the Court's territorial jurisdiction ruling did not violate Liggins's due process rights because "there was a 'rational connection' between the basic fact proved, that is, the location of Jennifer's body, and the ultimate fact presumed, that is, her death occurred in Iowa." Liggins, however, contends the location of Jennifer's body was insufficient proof she was killed in Iowa. He points to the Iowa Supreme Court's ruling that there was insufficient evidence to prove the other crimes occurred in Iowa and argues the statutory inference alone is constitutionally insufficient to establish proof beyond a reasonable doubt.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). "This bedrock, axiomatic, and elementary [constitutional] principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." Francis v. Franklin, 471 U.S. 307, 313 (1985) (citations and quotation marks omitted). "[A] criminal statutory presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." Leary v. United States, 395 U.S. 6, 36 (1969).

Here, the presumption of territorial jurisdiction in the murder charge was neither irrational nor arbitrary. Jennifer's body was discovered within a few hours of her disappearance only minutes from where she was last seen. She was strangled and the evidence tended to show she died within minutes. Additionally, Liggins was in the area of Jennifer's kidnaping when it occurred, was seen talking to her, and had ample time to transport her to Iowa, kill her, and return to Illinois. Thus, there is substantial assurance the presumed fact (Jennifer was murdered in Iowa) is more likely than not to flow from the proved fact (Jennifer was found murdered in Iowa). Accordingly, we reject this claim of error.

-10-

C

Liggins next argues an improper jury instruction relieved the jury of its obligation to find the murder occurred in Iowa. We disagree.

Liggins was tried for first-degree murder under a theory of felony-murder, requiring the state to prove Liggins either

(a) acted willfully, deliberately, premeditatedly and with a specific intent to kill Jennifer Lewis; or

(b) was participating in the offense of Willful Injury, Sexual Abuse, or Kidnapping of or to Jennifer Lewis as defined in Instruction No. 23.

App. at 393A.

The jury was further instructed it had to find one of the alleged offenses "was committed wholly or partly within the State of Iowa." App. at 393A. Finally, Jury Instruction 23 told the jury: "A person participates in an offense beginning with the first act done toward the commission of the offense and ending when the person has been arrested or has escaped from pursuers." App. at 393B.

Liggins contends these jury instructions permitted the jury to find territorial jurisdiction "[a]s long as [Liggins] got to Iowa before he was arrested, [because] all 'acts' that were 'done toward the commission of the offense' continued in Iowa." In other words, if the jury believed Liggins committed any of the acts alleged, and then later traveled to Iowa, territorial jurisdiction was established irrespective of where the acts occurred.

The Iowa Supreme Court concluded the instructions were a correct statement of Iowa law, and the trial court properly instructed the jury on the issue of

-11-

"participating" because Liggins was tried on the theory of felony murder. Liggins II, 557 N.W.2d at 267. "The definition contained in Instruction No. 23 was used to define the concept of 'participating in a forcible felony' for purposes of the felony-murder rule." Id.

Generally, issues relating to jury instructions in state-court proceedings involve "the application and interpretation of state law." Louisell v. Dir. of Iowa Dept. of Corrections, 178 F.3d 1019, 1022 (8th Cir. 1999) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). An instruction correctly setting forth state law does not, however, necessarily satisfy due process concerns. Id. We may grant habeas corpus relief when a "jury instruction constituted 'a fundamental defect' that resulted 'in a complete miscarriage of justice, [or] an omission inconsistent with rudimentary demands of a fair trial." Id. (citations omitted). Here, we find no such defect or omission. The jury was instructed it had to find one of the offenses was committed partly or wholly in Iowa. Instruction 23 defining participating in an offense did not relieve the jury of its duty to make such a finding. Thus, we find no merit in Liggins's argument.

D

Liggins next contends the state suppressed several police reports in violation of Brady v. Maryland. Under Brady, the government must disclose any evidence both "favorable to an accused" and "material either to guilt or to punishment." 373 U.S. at 87. Brady applies to exculpatory and impeachment evidence, United States v. Bagley, 473 U.S. 667, 676 (1985), whether or not the accused has specifically requested the information, Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). Evidence favorable to the accused is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 433-34 (quoting Bagley, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as

a trial resulting in a verdict worthy of confidence.  Id. at 434.  When analyzing a Brady claim, we do not consider the items of suppressed evidence individually, but rather collectively to determine whether they undermine confidence in the verdict. United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) (citing Kyles, 514 U.S. at 436).

       1.     Sarah Bea

Liggins contends a police report detailing an interview with Sarah Bea conducted on the evening of the murder contains, or would have led him to, exculpatory evidence.  The report states

> [Bea] had been driving [past Jefferson School on the evening of the murder].  She thought right around 9:00 p.m. or so.  She observed what she thought was garbage burning in the field behind Jefferson School with a couple other smaller fires in that general area.  She thought nothing unusual of it and drove by, said she saw what she thought was a red Camaro also driving by slowly in front of her, westbound, had no idea of the plates or any description of the occupants.  She had no further information.

The report was not disclosed to the defense and Bea did not testify at either trial.  On September 24, 1996, Bea contacted the Davenport Police Department claiming she had information about Jennifer's murder.  An officer conducted an interview of Bea on November 6, 1996.  During the interview, Bea reported driving to pick up a prescription just before 9:00 p.m. on the night of the murder.  On the way home, she claimed to have observed three white males in a small white car near Jefferson School.  She said a very thin man wearing a hat exited the white car and stood by what she believed were burning logs.  Bea reported seeing the man return to the white vehicle and drive it wildly towards her car.  Although she was accompanied by two young daughters, Bea claimed she positioned her car so the white vehicle would collide with her car if it attempted to pass by.  Bea further

-13-

claimed she confronted the other driver about setting her neighborhood on fire and asked whether he wanted to fight.

Bea described the driver's hat as a brown, winter-looking style hat with a broken arrow in the headband. Bea claimed the driver yelled, acted "crazy," and then left by driving into the ditch to get past her car. Bea told the investigator she got out of her car and walked to the fire. After discovering she had no blanket with which to extinguish the fire, she pounded on the school door to alert others. According to Bea, she was unable to make any contact and returned home where she placed a call to police. Bea claimed she reported this information and provided her name, address, and the license plate number of the white car. Thereafter, Bea drove to the bus station to pick up her husband but later returned to the fire where she spoke to a detective who took her to the site of the fire. Bea said she withheld her name from the detective during this return visit but did give her address. Bea then claimed she returned home and spoke to her husband who instructed her not to speak to the police about the incident. Despite her husband's instruction, she returned to the scene a third time and told police her name was Peggy Ross. According to Bea, she did not give her real name because she felt physically threatened by her husband and hoped the investigating officers would contact her friend, Peggy Ross, who would send them to her. Bea claimed she did not contact the authorities again because her husband cautioned her to think about the risks posed to him and their children.

During the interview, Bea told the investigator she saw a television report about Jennifer's funeral a few days after September 17, 1990. She claimed the report showed a man helping a woman into a limousine and he was wearing the same hat she had seen on the driver of the white car. Bea said she called the County Attorney's office and the offices of Liggins's lawyers during the 1995 trial but received no return call. Finally, Bea told the interviewer her son was an inmate at the same penitentiary as Liggins and she had asked him to get a message to Liggins. A few days later, Liggins called and asked her to talk to his attorney.

-14-

Liggins contends the police report of the 1990 Bea interview contains exculpatory information and the state suppressed it in violation of <u>Brady</u>. He argues suppression of the report prevented him from presenting Bea's favorable and material testimony. The state contends Liggins failed to prove the report was suppressed and argues it is neither favorable nor material.

The Iowa Court of Appeals and the district court concluded the report was suppressed. We agree. To constitute a <u>Brady</u> violation, however, there must be "a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682. The state court found notable inconsistencies between the substance of the September 17, 1990, police report and Bea's version of events six years later. For example, on the night of the murder, Bea reported seeing a red Camaro but six years later she recalled confronting a small white vehicle. The September 17, 1990, report says Bea was unable to give a description of the occupants of the red Camaro, but six years later she gave detailed descriptions of the occupants of the white car and their clothing. The earlier report indicates Bea could not provide the license plate number of the Camaro, but six years later she claimed to have provided the license plate of the white vehicle. Finally, the state court found the credibility of Bea's 1996 statement diminished by her natural motivation to improve conditions for her son at the penitentiary. <u>Liggins III</u>, 2000 WL 1827164, at *4.

### 2. Daryl Sheese, Shawn Saunders, and Michael Armstrong

On the date of the murder, Liggins was the tenant at Hillside Apartments in Rock Island. The state called Donna Atkins who testified she frequently saw the Peugeot parked in front of her boyfriend Daryl Sheese's apartment in the Hillside Apartments' parking lot. She testified she walked past the vehicle on the morning of September 18, 1990, noticed the strong odor of gasoline, and saw a gas can sitting on the back seat. In September 1990, police interviewed Daryl Sheese, Shawn Saunders,

and Michael Armstrong about Liggins and their observations of his Peugeot. The reports of those interviews were not disclosed to the defense and Liggins contends they were exculpatory because they cast doubt on Atkins's testimony.

Sheese was a resident of Hillside Apartments at the time of the murder. When shown a photo of the maroon Peugeot, he did not recall seeing the vehicle on September 18, 1990, but did recall seeing a brown Mustang. Liggins contends the report proves Atkins was mistaken about seeing his car and she really saw a brown Mustang. The Iowa Court of Appeals found the report was suppressed and might have been useful to the defense. The court, however, determined the report was not material because Sheese was an alcoholic who was moving out of his apartment and into an alcohol treatment facility. Further, the court concluded Sheese's statement he "did not remember" seeing the Peugeot on September 18, 1990, and his recollection of seeing the brown Mustang, were not so compelling as to generate a reasonable probability the outcome of the proceeding would have been different. Id. at *5.

Police also interviewed Shawn Saunders, another resident of the Hillside Apartments. The police report disclosed Saunders owned a brown Mustang, frequently parked it in the Hillside Apartments' parking lot, but it never had a gas can in it. The report also said Saunders had seen the Peugeot and Liggins in the vicinity of the apartments in the past. The Iowa Court of Appeals found the report was suppressed and at least somewhat favorable to the defense because it corroborated Sheese's statement about a brown Mustang. Nevertheless, the court concluded the report was not material because it did not address whether the Peugeot was present on September 18, 1990, as Atkins claimed, and there was no reasonable probability a different outcome would have resulted if the Saunders report had been produced. Id.

Finally, Michael Armstrong , another resident of the Hillside Apartments was interviewed. The report of the interview indicated Armstrong could not say whether

-16-

he had ever seen the Peugeot, but he acknowledged using a brown Mustang owned by Saunders. He denied having a gas can in the vehicle. The state court again found the police report was suppressed and possibly favorable to Liggins, but concluded it was not material because Armstrong's equivocal statements concerning the Peugeot did not substantially refute Atkins's testimony. Id.

We do not condone the state's conduct in failing to make these reports available to the defense. Nevertheless, we cannot say that taken collectively there was a reasonable probability the outcome of the trial would have been different had they been produced. Bea's statement is replete with inconsistencies and her credibility is dubious. The remaining three reports are of questionable value. They hint at the possibility Atkins may have confused the Peugeot with the Mustang, but do not sufficiently undermine her testimony as to create a reasonable probability the verdict would have been different. Thus, we agree there was no Brady violation.

### 3. Funeral Videotape

At both trials Liggins argued Jennifer's stepfather, Joseph Glenn, was the murderer. The factual predicate for this theory came, in part, from the testimony of Roberta Kadera. Kadera stated she drove past Jefferson School at about 9:00 p.m. on September 17, 1990, saw a fire, and saw a man with long hair running toward the woods. Kadera testified the man was wearing a black leather jacket with "silver studs and fringes." Patricia Rhoads, a neighbor of the Glenns, testified Joseph wore a "black leather jacket all the time." Rhoads described the jacket as having "silver buttons or silver punch things and . . . tassels." Sherri Glenn testified her husband once owned such a coat but pawned it prior to September 17, 1990. Joseph testified he did not own or have access to a leather jacket with metallic decorations in September 1990.

-17-

Liggins contends Joseph Glenn's testimony was false. In support of his contention, Liggins offers a videotape of Jennifer's funeral showing Joseph Glenn wearing a leather coat. The videotape was broadcast by a Rock Island television station in September 1990, and a copy was in the possession of the state but not produced to the defense. Liggins's counsel obtained a copy of the tape after Liggins was convicted for the second time. The Iowa Court of Appeals found the tape was not suppressed because it was broadcast by a television station and Brady only applies when evidence discovered after trial was "known to the prosecution but unknown to the defense." Id. at *6 (citations omitted). In other words, the videotape was not evidence known only to the prosecution because it was seen by many people in the Rock Island area and was equally accessible to the defense. The court further concluded the tape would not have changed the outcome of the trial because there were no metallic decorations visible on the jacket. Id.

The district court concluded the Iowa state court's ruling was a reasonable application of federal law based upon a reasonable determination of the facts. We agree. Brady applies to information "exclusively within the prosecutor's control and knowledge." United States v. Oliver, 908 F.2d 260, 262 (8th Cir. 1990) (quoting Lugo v. Munoz, 682 F.2d 7, 9 (1st Cir. 1982)). Because the videotape was widely disseminated and equally available to the defense, we find no Brady violation. Additionally, having carefully reviewed the videotape, we, like the Iowa Court of Appeals, are unable to detect any metallic decorations.

E

Liggins's final argument is the district court erred by refusing to allow additional discovery and in refusing to hold an evidentiary hearing. We conclude the district court properly rejected this claim and affirm. See 8th Cir. R. 47B.

-18-

## III

We affirm the district court's denial of habeas relief and dismissal of Liggins's § 2254 petition.

_____