# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4021

_____

Byron Morales,                    *
                                  *
            Appellant,            *
                                  *   Appeal from the United States
      v.                          *   District Court for the
                                  *   Southern District of Iowa.
John F. Ault,                     *
                                  *
            Appellee.             *

_____

Submitted: May 17, 2006
Filed: February 7, 2007

_____

Before WOLLMAN, BRIGHT, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Byron Morales petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2000). He challenges his 1997 Iowa state court conviction for first-degree murder, which was upheld by the Iowa Court of Appeals on direct appeal and in post-conviction proceedings. Morales asserts two grounds for habeas relief: (1) he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution and (2) the state failed to disclose potentially

exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The District Court[1] denied the petition and Morales now appeals. We affirm.

I.

Shortly after 1:00 p.m. on November 10, 1995, Byron Morales made an emergency call to 911 and reported that his two-year-old son[2] Kevin was unresponsive. When paramedics arrived, Morales told them that Kevin had fallen down the stairs leading to the basement. Morales said that after the fall he put Kevin to bed but called for an ambulance when Kevin began having difficulty breathing. The paramedics took Kevin by ambulance to a local hospital. Upon arrival at the hospital, Kevin was unresponsive, had a low heart rate, and was having trouble breathing. The right side of his head was swollen, and a large pool of blood could be felt under his scalp. A CT scan revealed a skull fracture and a large hematoma on Kevin's brain. Dr. Thomas Carlstrom, a neurosurgeon, operated on Kevin to remove the hematoma. Kevin died during the surgery. Dr. Carlstrom, along with Dr. Donald Moorman, who was the surgeon leading the trauma team, and Dr. Dominic Frecentese, who was the radiologist that interpreted the CT scan, initially agreed that Kevin's death was caused by an existing, or chronic, hematoma on his brain that was re-injured by some event that day.

On November 11, 1995, Dr. Thomas Bennett, then the Iowa State Medical Examiner, performed an autopsy of Kevin's body. Dr. Bennett concluded that Kevin's brain injuries were acute, not chronic. He based his opinion in part on an examination of microscopic slides taken during the autopsy. In Dr. Bennett's view, the slides conclusively established that there had been no preexisting hematoma and that Kevin's

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

[2]Kevin was born to Morales's wife and adopted by Morales.

injuries were all inflicted on the day of his death. Dr. Bennett reported the probable cause of death as "Blunt traumatic head injuries from blow to head, due to Shaken-Slammed Baby Syndrome." J.A. at 967. A police investigation ensued, and on November 12, 1995, Morales was arrested and charged with Murder in the First Degree.

Subsequent to Morales's arrest, his first attorney, James Benzoni, requested that a second autopsy be performed. He hired Dr. Michael Berkland, then the Deputy Medical Examiner in Kansas City, Missouri, to conduct the second autopsy. In conducting his autopsy, Dr. Berkland had access to Dr. Bennett's autopsy report, the microscopic slides, and Kevin's body. Because prosecutor Melodee Hanes had given instructions not to release Kevin's medical records to the defense team, however, Dr. Berkland did not at that time have the medical reports of the emergency-room physicians who diagnosed the hematoma as chronic in nature. Dr. Berkland concurred with Dr. Bennett that the injuries to Kevin's brain were acute.

In December 1995, the county prosecutor's office arranged a meeting at Dr. Carlstrom's office that was attended by four prosecutors and Doctors Bennett, Carlstrom, and Moorman. Morales's attorneys were not notified about the meeting. During the meeting, Dr. Bennett reported that the microscopic autopsy slides showed that Kevin's brain hematoma was acute, not chronic. As a result of Dr. Bennett's conclusions and without examining the slides themselves, Doctors Carlstrom and Moorman changed their opinions to align with Dr. Bennett's opinion that the injury was acute.

A jury trial was held in December 1996 in the Iowa District Court for Polk County. Morales was represented by Rodney Ryan and John Spellman. His theory of defense was that Kevin fell down a flight of eight stairs on November 10, 1995, thereby aggravating a preexisting hematoma and leading to his death. The jury found Morales guilty of first-degree murder, and the trial court sentenced him to life in

prison. The Iowa Court of Appeals affirmed the conviction. Morales then sought post-conviction relief, which the Iowa courts denied. Thereafter, he filed his federal petition for writ of habeas corpus, which the District Court denied. Morales now appeals the denial of the writ.

II.

This is a sad and difficult case. A young boy is dead, while his father's conviction for the death rests on judicial proceedings that have raised multiple questions of fairness and just prosecution. Every court that has reviewed this case has been struck by certain aspects of the trial and actions of prosecutors that violate the fundamental notions of fair play on which our legal system is based. For example, the Iowa District Court for Polk County, addressing Morales's application for post-conviction relief, found prosecutor Hanes's instruction to withhold medical records from the defense team prior to the second autopsy "suspicious at best" and the prosecution-arranged meeting at which Kevin's treating physicians changed their opinions about the nature of Kevin's brain injury "questionable." Morales v. Iowa, No. PCCE 37829, slip op. at 3, 19 (Iowa District Court for Polk County Apr. 30, 2001). The Iowa Court of Appeals, while affirming the denial of post-conviction relief, "agree[d] with Morales that certain questionable activities and practices, which became known after his trial, cast a level of doubt on some evidence used to convict Morales in the death of his son." Morales v. Iowa, No. 2-520/01-1328, slip op. at 21 (Iowa Ct. App. Nov. 15, 2002). The District Court reviewing Morales's habeas corpus petition aptly observed that the "pretrial and trial process [in Morales's case] at best falls short of our expectations for so serious an endeavor." Morales v. Ault, No. 4:03-cv-40347, slip. op. at 2 (S.D. Iowa Sept. 28, 2005). The District Court summarized the most egregious errors as follows:

> A prosecutor instructed that evidence be withheld. Prosecutors arranged
> a meeting between the Medical Examiner and treating physicians,

-4-

arguably to impact their trial testimony to be more consistent with that of the Medical Examiner. Important microscopic slide evidence, relied upon by the Medical Examiner, was not pursued by defense counsel or produced by the prosecution during the trial, and the slides were destroyed while the case was on appeal. Similar opinions by this Medical Examiner, often based upon such slides, have arguably been discredited in other cases. The treating surgeon has now recanted his trial testimony, at least to the extent of placing any reliance on the opinions of the Medical Examiner. Defense counsel failed to pursue the slides, failed to interview treating physicians before their trial testimony, failed to investigate the Medical Examiner even by simply networking with other defense lawyers, failed to pursue the meeting between the Medical Examiner and other physicians in relation to their apparent change in position at trial from their prior reports, failed to make objections necessary to preserving a record for appeal, and failed to make an adequate offer of proof regarding the romantic relationship between a prosecutor and the Medical Examiner.

Id. at 2–3.

Like the courts preceding us, we are troubled by these incidents and add our condemnation of such practices. That said, however, we conclude that Morales's petition for habeas relief must be denied. Quite simply, our decision in this case hinges on the standard of review that Congress has given us to apply.

Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), when a state prisoner files a petition for writ of habeas corpus in federal court we are directed to undertake only a "limited and deferential review of [the] underlying state court decisions." Lomholt v. Iowa, 327 F.3d 748, 751 (8th Cir.), cert. denied, 540 U.S. 1059 (2003). We may not grant a writ of habeas corpus unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or the state court's decision "was based on an unreasonable determination of

-5-

the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405–06 (2000).  A state court decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  Id. at 407–08.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*."  Id. at 411 (emphasis added).  "Rather, that application must also be *unreasonable*."  Id. (emphasis added).  Finally, a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in the state court proceedings" only if it is shown that the state court's presumptively correct factual findings are rebutted by "clear and convincing evidence" and do not enjoy support in the record.  28 U.S.C. § 2254 (d)(2), (e)(1);  see also Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir.), cert. denied, 543 U.S. 1027 (2004).

Perhaps we would have reached a result different from the result reached by the Iowa courts, but we cannot deem the state courts' application of the law unreasonable or its factual findings clearly rebutted.  Like the District Court, we find support for the state courts' determination that the overwhelming evidence of Morales's guilt overcame the defects in his criminal proceedings.  We therefore affirm the District Court's denial of the habeas petition.[3]

---

[3]We review the District Court's factual findings for clear error and its legal conclusions de novo.  See Johnston v. Luebbers, 288 F.3d 1048, 1051 (8th Cir. 2002), cert. denied, 537 U.S. 1166 (2003).

## III.

As his first ground for habeas relief, Morales asserts that his Sixth Amendment rights were violated because his trial attorneys were ineffective.

"A criminal defendant is constitutionally entitled to the effective assistance of counsel on direct appeal, as well as at trial." Bear Stops v. United States, 339 F.3d 777, 780 (8th Cir.) (citing Evitts v. Lucey, 469 U.S. 387, 396 (1985)), cert. denied, 540 U.S. 1094 (2003). To establish a claim of ineffective assistance of counsel, a movant must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, under the "performance" component, the movant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." Strickland, 466 U.S. at 687. Second, under the "prejudice" component, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "It is not sufficient for a defendant to show that the error had some 'conceivable effect' on the result of the proceeding because not every error that influences a proceeding undermines the reliability of the outcome of the proceeding." Odem v. Hopkins, 382 F.3d 846, 851 (8th Cir. 2004) (quoting Strickland, 466 U.S. at 693).

Morales sets forth a number of errors allegedly committed by his trial counsel. First, he argues that his counsel "breached their duty to investigate" by failing to discover the microscopic autopsy slides of Kevin's hematoma and by failing to understand the slides' significance, particularly their influence on the opinions of Doctors Carlstrom and Moorman. Appellant's Br. at 23. Second, Morales criticizes counsel's treatment of Dr. Bennett, the Iowa Medical Examiner. Morales asserts that counsel failed to uncover readily available "impeachment material" about Dr. Bennett, id. at 25, and ineffectively used the impeachment material that they did have by making only a professional statement, rather than an offer of proof, to show that Dr.

Bennett was romantically involved with prosecutor Hanes. Morales further argues that counsel erred by not objecting to Dr. Bennett's inflammatory testimony analogizing the force necessary to cause Kevin's injuries to a "40-foot fall onto a flat surface," "a 35-mile-an-hour car crash into a . . . concrete barrier," and "a blow with a baseball bat from like a home-run swing." J.A. at 557–58. Third, Morales claims that his trial counsel was deficient in their decision not to introduce certain evidence at trial. Morales asserts that counsel should have introduced the orthopedic shoes worn by Kevin and should have called a biomechanical engineer who was prepared to testify that Kevin's brain hematoma could have developed when Kevin fell down stairs two months before his death.

The Iowa Court of Appeals addressed each of these asserted errors and concluded that they did not prejudice the result of Morales's trial. We cannot say that this conclusion was unreasonable. Although the list of errors is disturbing, when we step back and consider all of the evidence pointing to Morales's guilt we have little difficulty concluding that the errors had no effect on the outcome of the trial. Morales cannot satisfy Strickland's prejudice prong. See Reed v. Norris, 195 F.3d 1004, 1006 (8th Cir. 1999) (finding it impossible for the movant to establish prejudice where the evidence of his guilt was overwhelming).[4]

---

[4]The Iowa Court of Appeals also rejected the notion that the performance of attorneys Spellman and Ryan fell outside the wide range of professional assistance deemed constitutionally acceptable. Because we conclude that the state courts' application of Strickland's prejudice prong was not unreasonable, however, we need not address its application of Strickland's performance prong. See Blankenship v. United States, 159 F.3d 336, 338 (8th Cir. 1998) (recognizing that "we need not address the competency of counsel's performance if the prejudice issue is dispositive"), cert. denied, 525 U.S. 1090 (1999). It is clear from Judge Bright's dissenting opinion addressing the performance of Morales's trial counsel that Judge Bright disagrees with our view that the evidence against Morales was overwhelming.

First, we note that no less than seven doctors testified that Kevin's injuries were not consistent with a fall down stairs—Morales's defense theory. For example, Dr. Christopher Ellerbroek, a pediatric radiologist, testified that Kevin suffered an acute, massive brain injury that could not be caused by a fall down a flight of stairs, even one with a concrete wall at the bottom. Dr. Ellerbroek opined that Kevin's head was either struck by an object or struck a fixed object while moving rapidly. Dr. Ellerbroek's conclusions were supported by Dr. Charles Jennissen, the pediatric physician who treated Kevin in the emergency room. Dr. Jennissen testified that Kevin's CT scan revealed a large scalp hematoma, bleeding in the subarachnoid and subdural spaces of the brain, and an extensive skull fracture. Dr. Jennissen opined that retinal hemorrhages discovered during the autopsy were "nearly pathognomonic of a non-accidental injury." J.A. at 311. Dr. Jennissen further opined that "serious injury from a fall down a stairs is extremely uncommon," id. at 314, and concluded that Kevin's injuries were consistent with being shaken and then slammed into an object.

Many of the testifying physicians attempted to quantify the amount of force that was necessary to cause Kevin's brain injury. Dr. Ellerbroek described the necessary force as "a massive amount of force that we see in very serious motor vehicle accidents . . . the kind of force you would expect to see if a child were to fall from a third or fourth story window." Id. at 423. Dr. Jennissen testified that the injury only could have been caused by a blow of "extreme force." Id. at 318. Dr. Carlstrom described the necessary blow as a "very hard blow to the head," id. at 361, having a "large force," id. at 356. Dr. Moorman testified that "[i]t would take a significant force to create this type of skull injury." Id. at 371. The jury heard all of these descriptions prior to Dr. Bennett taking the stand. Thus, although Dr. Bennett's descriptions of the force to Kevin's head were quite graphic, we cannot say that the Iowa Court of Appeals was unreasonable in ruling that counsel's failure to object to Dr. Bennett's descriptions was not prejudicial.

-9-

The whole of Dr. Bennett's testimony was cumulative of the testimony of the state's other experts. Even if Dr. Bennett had been impeached at trial and his testimony completely discredited, therefore, the jury would likely have found Kevin's injury to be the result of Shaken-Slammed Baby Syndrome, rather than a fall down the stairs.[5] While it is true that Dr. Bennett was the only person to testify about the microscopic autopsy slides of the hematoma, perhaps due in some part to Morales's trial counsel's failure to discover them, Morales could not have been prejudiced by that fact. As noted by the Iowa Court of Appeals, nothing in the record indicates that the slides contained exculpatory information. Although the slides were not produced to Spellman and Ryan, the slides were made available to Dr. Berkland and reviewed by Dr. Berkland in conjunction with his autopsy of Kevin. Despite Dr. Berkland's incentive as a defense expert to make findings in Morales's favor, Dr. Berkland did not find the slides to be exculpatory. Moreover, there is no evidence that Dr. Bennett somehow pressured or unduly influenced the treating physicians to change their opinions in light of the slides.[6] Thus, as stated by the Iowa Court of Appeals, "[a]ny

_____

[5]We agree with the District Court that evidence of Dr. Bennett's marriage to prosecutor Hanes should have been permitted at trial to imply bias. As the District Court recognized, however,

> such an attack on Dr. Bennett's potential bias pales in comparison to the other evidence in the case that is consistent with Dr. Bennett's opinion. It would have been preferable for counsel to have made a detailed offer of proof to demonstrate to the trial court and reviewing courts the nature of the relationship and its potential impact on Dr. Bennett's testimony, but the issue was minimally preserved for appellate review. The Iowa courts found that the other evidence of guilt was so overwhelming that any error as to this evidence was not prejudicial, and that finding cannot be found unreasonable.

Morales v. Ault, No. 4:03-cv-40347, slip op. at 17 n.15 (S.D. Iowa Sept. 28, 2005).

[6]We do not mean to exculpate the inappropriate meeting arranged by prosecutors presumably for the purpose of influencing the opinions of Kevin's treating

-10-

claims an investigation would have uncovered a conspiracy or improper influence are pure conjecture." Morales v. Iowa, No. 2-520/01-1328, slip op. at 15 (Iowa Ct. App. Nov. 15, 2002).

Morales's own expert doctor confirmed much of what the state's doctors found. Dr. Jan Leestma, a neuropathologist, concluded that Kevin's injuries were acute. Although Dr. Leestma testified that Kevin's injuries could have been caused by a fall down a flight of stairs landing against a concrete wall, he also conceded that Kevin's injuries were classic signs of Shaken-Slammed Baby Syndrome. Additionally, Dr. Leestma admitted that he opined in a published book: "When vehicular and other forms of major accidental trauma can be ruled out, the child who's been said to have fallen in the home from a low height or down stairs, who sustains anything other than simple, narrow, linear, parietal skull fracture without significant neurological sequalae, should be considered a child-abuse victim until proven otherwise." J.A. at 618. While Morales claims that his retained biomechanical engineer was prepared to offer testimony indicating that Kevin's injuries could have been accidental, we cannot say that the addition of such testimony would have created a reasonable probability of acquittal in light of other evidence highly indicative of Morales's guilt. In any event, such testimony would have duplicated testimony from Dr. Leestma that Kevin's injuries could have been sustained in a fall down the stairs. Nor would the introduction of the orthopedic shoes worn by Kevin have had a significant effect.

---

physicians based on Dr. Bennett's interpretation of the microscopic slides. Rather, we are simply concluding that the state courts were not unreasonable in finding that this meeting, unrevealed to Morales's trial counsel, did not prejudice Morales.

We also note that the jury was made aware that Dr. Frecentese changed his medical opinion about the nature of Kevin's injuries (though it does not appear that Dr. Frecentese was at the secret meeting). Dr. Frecentese testified that while his initial interpretation of the x-rays was that Kevin suffered a chronic hematoma with an acute rebleed, after reviewing the medical literature he opined that the injury was acute, inflicted very close in time to the CT scan.

-11-

Because there was testimony at trial about Kevin's turned-in foot and the shoes and braces worn to correct the condition, the introduction of the shoes themselves would have been no more than cumulative evidence.

The non-medical evidence in the case also supports the Iowa Court of Appeals's finding of "overwhelming" evidence of Morales's guilt. Morales v. Iowa, No. 2-520/01-1328, slip op. at 2 (Iowa Ct. App. Nov. 15, 2002). Morales's accounts of the events were inconsistent and frequently implausible. Morales told the paramedics that Kevin fell two hours before Morales called 911, but this was belied by evidence that Kevin was fine at 1:00 p.m. and that the ambulance was dispatched at 1:23 p.m. When interviewed by a doctor at the emergency room, Morales stated that only five minutes had passed between the fall and the 911 call. Later, Morales told police officer Charles Lewis that Kevin spoke to him after the fall, saying that he was okay, and that Kevin later got out of bed and was standing. But almost all of the medical evidence introduced indicated that Kevin's injuries were too severe for these actions to have taken place. Morales told his wife and police investigators that Kevin fell in the course of taking his jacket to the basement, but the jacket was found in the living room upstairs. Moreover, at no time did Morales suggest that he heard anything more than what sounded like a fall from a few steps. This is inconsistent with his defense at trial that Kevin fell from the top of the stairs and landed against a cement wall. Paramedic Michael Herra testified that Morales was very nervous and vague when questioned about how the incident occurred. Morales later made untrue and minimizing statements to his wife about the incident. Finally, the record contains evidence of other possible abuse of Kevin while he was in Morales's care. For example, Kevin was treated at the hospital for allegedly accidental injuries on three occasions in the six months preceding his death.

After examining the record, we conclude that the ruling of the Iowa Court of Appeals did not involve an unreasonable application of federal law. The state court was reasonable in its determination that overwhelming evidence of Morales's guilt

-12-

overcame any trial defects affected by Morales's counsel. The District Court did not err when it denied this claim.[7]

## IV.

Morales's second claim is that the state failed to disclose potentially exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the Supreme Court held that due process requires the government to disclose material, exculpatory evidence to the defendant. Id. at 87. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Prejudice cannot be shown "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id. at 281. In determining whether confidence in the verdict has been undermined, we consider the items of suppressed evidence collectively, rather than individually. Liggins v. Burger, 422 F.3d 642, 651–52 (8th Cir. 2005), cert. denied, 126 S. Ct. 1359 (2006).

Morales contends that the state committed three Brady violations: (1) the state did not release the medical records of Doctors Frecentese, Moorman, and Carlstrom prior to Dr. Berkland's autopsy of Kevin, (2) the state did not tender the microscopic autopsy slides to Morales's trial counsel, and (3) the state destroyed the microscopic autopsy slides while Morales's case was on direct appeal. After considering each of these assertions, the Iowa courts determined that no Brady violation exists to warrant

---

[7]Having assumed that there was no procedural obstacle to Morales's claim of ineffective assistance of trial counsel, we have concluded that this claim was appropriately rejected. It is therefore not necessary for us to address the merits of whether Morales was procedurally barred from raising the claim. See Odem v. Hopkins, 382 F.3d 846, 852 (8th Cir. 2004).

a new trial. We cannot find that determination unreasonable or contrary to federal law.

Morales's first argument is that the state violated Brady by failing to turn over the medical records of Kevin's treating physicians on or before the date of the second autopsy. While Morales concedes that the state produced these medical records prior to trial (the record shows that they were produced about a year in advance of trial and were used by the defense at trial), he argues that the records would have been exculpatory if received by Dr. Berkland prior to his autopsy of Kevin because they would have influenced Dr. Berkland "to conclude that Kevin's hematoma was an old injury with a 'rebleed,'" rather than an acute injury. Appellant's Br. at 35. The Iowa post-conviction district court rejected this argument based on Dr. Berkland's post-conviction testimony that his review of the medical records, albeit after the autopsy, did not change his opinion that Kevin's injury was acute or hyper-acute. Accordingly, the state court found that Morales could establish no prejudice from this potential Brady violation. We agree. Given Dr. Berkland's testimony to the contrary, Morales did not show a reasonable probability that the "suppressed"[8] evidence would have produced a different verdict.

Morales next argues that the state violated Brady by not giving the microscopic autopsy slides to his trial counsel. The Iowa courts rejected this argument on two grounds.[9] First, the state courts found that the slides were not suppressed—they were

---

[8]We question whether the medical records were truly suppressed under Brady's second prong given that the state produced them a year before trial. See United States v. Almendares, 397 F.3d 653, 664 (8th Cir. 2005) ("Under the rule in our circuit Brady does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial."). The state court did not address this issue, however, and we need not reach it to determine that the state court's decision was in accordance with federal law.

[9]We reject Appellee's argument that this Brady claim was not preserved.

-14-

produced to Morales through his original attorney, Benzoni, and through his expert medical examiner, Dr. Berkland. The post-conviction district court stated:

> One of the fundamental tenets of <u>Brady</u> is that exculpatory evidence was actually suppressed. <u>Brady v. Maryland</u>, 373 U.S. 85, 87 (1963). The court notes that the microscopic slides were produced to Petitioner via his hired medical consultant, Dr. Berkland. <u>Testimony of Doctor Berkland</u>, Apr. 16, 2001. Additionally, the court does not find any evidence in the record that the microscopic slides were withheld at any point up to and through the original trial.

<u>Morales v. Iowa</u>, No. PCCE 37829, slip op. at 5 n.3 (Iowa District Court for Polk County Apr. 30, 2001). The Iowa Court of Appeals similarly found that the "slides were made available to Morales's original counsel and defense expert." <u>Morales v. Iowa</u>, No. 2-520/01-1328, slip op. at 12 (Iowa Ct. App. Nov. 15, 2002). Morales has not rebutted these presumptively correct factual findings with clear and convincing evidence, and we deem the findings reasonable.

The Iowa courts' second basis for rejecting this argument was the lack of "direct evidence that the microscopic slides were 'exculpatory.'" <u>Morales v. Iowa</u>, No. PCCE 37829, slip op. at 7 (Iowa District Court for Polk County Apr. 30, 2001). Again we find the state courts' determination reasonable. Dr. Berkland reviewed the slides and, despite having an incentive as a defense expert to make findings in Morales's favor, concurred with Dr. Bennett's autopsy findings. <u>See</u> <u>United States v. Rouse</u>, 410 F.3d 1005, 1010 (8th Cir. 2005) (ruling that defendants cannot establish a <u>Brady</u> violation when "defendants can only speculate that the [suppressed evidence] might have contained material *exculpatory* information").

Finally, Morales asserts that the state violated <u>Brady</u> by destroying the microscopic autopsy slides while his direct appeal was pending. Because Morales failed to demonstrate that the slides were suppressed and were exculpatory, as

discussed above, the Iowa courts rejected this argument. The state courts were reasonable in reaching this conclusion. The Iowa Court of Appeals also held that Morales failed to demonstrate that the state destroyed the slides in bad faith. To establish a due-process violation when a state destroys evidence that is potentially useful to a criminal defendant, the defendant must show that the state acted in bad faith. Illinois v. Fisher 540 U.S. 544, 547–48 (2004) (per curium); Arizona v. Youngblood, 488 U.S. 51, 58 (1988). We agree that Morales did not make this showing; the record indicates that the slides were destroyed as part of a blanket disposition of closed files at the Iowa Department of Criminal Investigation. While destroying this evidence during the pendency of Morales's direct appeal was certainly negligent, nothing in the record indicates that it was done in bad faith. The District Court appropriately denied relief on Morales's Brady claim.

V.

For the reasons discussed, the District Court's denial of Morales's petition for writ of habeas corpus is affirmed.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent.

There is no overwhelming evidence of guilt in this case. The jury never heard the complete medical facts because counsel failed to interview the most important witnesses, Kevin's treating physicians.

As of the trial, Morales's counsel knew or should have known the following: (1) Doctors Carlstrom and Moorman treated Kevin on the night he died; (2) Doctors Carlstrom and Moorman concluded, at the time he was admitted to the hospital, that Kevin died as a result of a rebleed of a chronic subdural hematoma; (3) Kevin's

-16-

medical records, the CT Scan, and Doctor Carlstrom's observations of Kevin's skull during surgery showed that the blood in Kevin's head displayed characteristics consistent with a rebleed of a chronic subdural hematoma; (4) Doctors Carlstrom and Moorman attended a meeting (along with another one of Kevin's treating physicians) orchestrated and attended by at least four county prosecutors and medical examiner Doctor Bennett, all of whom maintained that Kevin died from shaken-slammed baby syndrome; (5) one of the county prosecutors who attended the meeting assisted in a child death review team and was romantically involved with medical examiner Doctor Bennett; (6) after the meeting, Doctors Carlstrom and Moorman changed their opinions to be consistent with those of Doctor Bennett and the government that Kevin died from shaken-slammed baby syndrome; and (7) Doctors Carlstrom and Moorman would testify for the government at trial.

Yet, despite this knowledge, the record shows that trial counsel did not personally interview Doctor Carlstrom or Doctor Moorman. It is clearly established that "[defense] counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. 668, 691 (1984). This court has explained that under Strickland "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993). Morales's counsel's failure to interview Doctors Carlstrom and Moorman to investigate the circumstances of their changed testimony fell below constitutional standards of competence in light of the doctors' changed opinions as to the cause of Kevin's death.

This deficient representation undoubtedly undermines any confidence in the verdict against Morales, see Strickland, 466 U.S. at 694, and the state court's determination to the contrary was unreasonable. The record establishes that the important medical evidence and opinions of the attending physicians could significantly impair the government's theory that Kevin's death resulted from shaken-

-17-

slammed baby syndrome and demonstrates that Kevin died from an old, chronic condition rather than a recent injury. Moreover, the record shows that prosecutors played a key role in presenting skewed medical opinion evidence from the physicians who treated Kevin on the day he died by hosting a meeting, not disclosed to or attended by defense counsel, and using the opinion of a possibly biased medical examiner to persuade the treating physicians to change their initial opinions. That meeting resulted in Doctor Carlstrom changing his opinion as to the cause of Kevin's death. All of this would have come to light if defense counsel did what any minimally competent lawyer would do: personally interview the important witnesses.[10]

Armed with the information counsel would have obtained by interviewing the physicians, Morales's trial would have been quite different. First, Doctor Carlstrom's testimony would have been less persuasive, if not entirely different. Judge Sackett of the Iowa Court of Appeals, writing separately in this case on direct appeal, explained that in determining that Kevin suffered from shaken-slammed baby syndrome he

---

[10]As part of the record before us, I have examined two pages (which was all that was provided to this court) of deposition testimony of Doctor Carlstrom, apparently taken by Morales's former counsel prior to trial and which were available to Morales's trial counsel. Counsel's reliance on this deposition alone serves as inadequate investigation of the doctors' change in testimony. The deposition reveals that Doctor Carlstrom changed his original medical opinion, which he had based on his own personal observations, upon inducement by the medical examiner and not based on any objective medical evidence that Doctor Carlstrom had observed. The information gleaned from the deposition, at a minimum, required further investigation by competent counsel in preparation for trial.

Indeed, a number of the other bases on which Morales argues ineffective assistance of counsel, such as failure to investigate and impeach Doctor Bennett and failure to pursue the slides, are derivative of counsel's failure to interview Doctors Carlstrom and Moorman. These two interviews would have resulted in counsel's appreciation of the significance of the slides and Doctor Bennett's improper influence as avenues for Morales's defense. The slides, unfortunately, are no longer available as they have been destroyed by the State of Iowa.

"look[ed] particularly to the testimony of Dr. Thomas Carlstrom, the neurosurgeon who operated on the victim[.]" If counsel had interviewed Doctor Carlstrom, a jury would have heard his original (and current) opinions as to the cause of Kevin's death: the blood in Kevin's skull was liquid, consistent with a rebleed of a chronic hematoma; the CT scan and other treating physicians confirmed this observation and diagnosis; the injury Doctor Carlstrom had observed was the type of injury that very little trauma could cause to rebleed; a fall down a flight of stairs, hitting a concrete wall at the bottom, could cause a linear fracture and, because of the presence of the chronic hematoma, could cause a rebleed and ultimately death.[11]

By way of example, of the information described above, the jury heard Doctor Carlstrom state, on direct examination, that the blood in Kevin's skull was liquid and that was "a bit unusual." On cross examination, Doctor Carlstrom surmised that Kevin's blood was probably unable to clot. Had counsel interviewed or made a complete investigation of Doctor Carlstrom prior to trial, counsel could have confidently inquired further and a jury would have heard Doctor Carlstrom state, as he did in his post-conviction testimony:

> Well, I think that the blood clot itself, when I saw it, what I saw at the time of surgery and on the CT scan, everything that I saw pointed to this blood clot being an old blood clot. I was quite certain it was. I have never seen a brand-new blood clot liquid like this one was. This would be the only case I have ever seen like that, and the only explanation for it could be that undeniable pathological identification would indicate that there was no – that this was not a chronic subdural hematoma. I still can't explain how one can have a blood clot hours old that was all liquid. That's a very difficult – a very difficult pathological – very difficult to occur.

App. at 660.

---

[11]See App. at 660-663 (from Doctor Carlstrom's post-conviction testimony).

In addition, if counsel had investigated the *cause* of the doctors' changed opinions, they could have presented that information in court, discrediting not only Doctor Bennett, the state medical examiner,[12] but also the prosecution itself in this case. Although counsel attempted to make a professional statement about Doctor Bennett's romantic relationship with a county prosecutor, they failed to make an adequate offer of proof and failed to link it in a material way to the case. Had counsel interviewed Doctor Carlstrom and investigated the cause of his changed testimony (the improper meeting hosted by Doctor Bennett and the prosecutor's office), counsel would have been able to connect Doctor Bennett's alleged bias to the case and significantly impair the credibility of the state's witnesses in this case. Significantly, then Doctor Carlstrom himself might have begun to question the propriety of the meeting and Doctor Bennett's conclusions.[13]

Both the district court and my colleagues on this court have noted that every court that has reviewed this case has been troubled by issues of fairness it presents. Those issues represent substantial flaws in Morales's conviction. Those flaws should have bothered Morales's trial counsel enough to prompt them to fully prepare and investigate a case calling for a possible life sentence.

---

[12]Characterization of Doctor Bennett's testimony by the state courts as "cumulative" belittles the weight a jury would give a state medical examiner's testimony. See Iowa v. Morales, No. 8-074/97-152, slip op. at 6 (April 24, 1998) (en banc).

[13]Doctor Carlstrom has stated now that he no longer considers Doctor Bennett trustworthy, explaining: "I think that Dr. Bennett's testimony in other child abuse cases has come into question because I think he's just a bit overzealous in his opinion giving. I have disagreed with his opinions on a number of occasions." App. at 661.

If only Morales's counsel had fully investigated this case, Doctor Carlstrom's skepticism of Doctor Bennett would not have come so late.

Accordingly, I dissent.  Morales is entitled to relief and the writ of habeas corpus should have been ordered by the district court.

_____